# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE ORACLE CORPORATION DERIVATIVE LITIGATION | ) ) | CONSOLIDATED C.A. No. 2017-0337-SG |

## MEMORANDUM OPINION

Date Submitted:  June 5, 2020
Date Decided:  July 9, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher P. Quinn, and Bradley P. Lehman, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and David A. Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brian J. Robbins, Stephen J. Oddo, and Gregory Del Gaizo, of ROBBINS LLP, San Diego, California, *Attorneys for Lead Plaintiff Firemen's Retirement System of St. Louis*.

Kevin R. Shannon, Berton W. Ashman, Jr., and David A. Seal, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Arthur H. Aufses, Jonathan M. Wagner, and Jason M. Moff, of KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, *Attorneys for Non-Party Special Litigation Committee of the Board of Directors of Oracle Corporation*.

Elena C. Norman and Richard J. Thomas, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants Lawrence J. Ellison and Safra A. Catz.*

Kenneth J. Nachbar, John P. DiTomo, and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Sara B. Brody and Jaime A. Bartlett, of SIDLEY AUSTIN LLP, San Francisco, California; Matthew J. Dolan, of SIDLEY AUSTIN LLP, Palo Alto, California, *Attorneys for Defendants Jeffrey O. Henley, Renée J. James, and Paula R. Hurd as Trustee of the Hurd Family Trust*.

Thomas A. Beck, Blake Rohrbacher, Susan M. Hannigan, Matthew D. Perri, and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Oracle Corporation*.

GLASSCOCK, Vice Chancellor

This unusual derivative litigation has generated the need for numerous rulings by this Court. The Lead Plaintiff is Firemen's Retirement System of St. Louis (the "Lead Plaintiff"). The litigation asset it here seeks to monetize on behalf of Nominal Defendant Oracle Corporation ("Oracle") sounds in fiduciary duty; that certain Oracle fiduciaries faithlessly caused Oracle to overpay in its purchase of NetSuite, Inc. ("NetSuite"). This claim was considered by a Special Litigation Committee of Oracle's Board of Directors (the "Special Litigation Committee" or "SLC"). The SLC determined that the Lead Plaintiff was the appropriate corporate agent to pursue the claims.

In reaching that determination, the SLC developed a record upon which it based its determination. By Memorandum Opinion of December 4, 2019,[1] I determined that the non-privileged parts of that record—and that part of the record over which only Nominal Defendant Oracle invoked privilege—were an enhancement to the value of the litigation asset. Accordingly, and in the corporate interest, I ordered that they be produced to the Lead Plaintiff by the SLC to assist the Lead Plaintiff in prosecution of the claims. Consistent with that decision, the SLC produced the record, accompanied by a privilege log of a few dozen documents it sought to preserve from disclosure to the Lead Plaintiff, on work product and attorney-client privilege grounds. The Lead Plaintiff then moved to compel. This

---

[1] *In re Oracle Corp. Derivative Litig.*, 2019 WL 6522297 (Del. Ch. Dec. 4, 2019).

1

Memorandum Decision addresses those privilege claims, and finds that the SLC has properly asserted work product protection; accordingly, the Motion to Compel is denied. A brief explanation follows.

## I. BACKGROUND[2]

This derivative action was filed on July 18, 2017.[3] The current complaint—the Third Amended Derivative Complaint (the "TAC")—now in its fourth iteration, alleges that Oracle vastly overpaid when it acquired NetSuite on November 5, 2016 (the "Acquisition").[4] Defendant Lawrence J. Ellison is a co-founder and current 35.4% stockholder in Oracle, and with his affiliates, beneficially owned 44.8% of NetSuite shortly before the Acquisition.[5] The TAC alleges that Ellison breached fiduciary duties to Oracle by orchestrating the Acquisition in his personal interest, in a process spearheaded by Oracle's CEO, Defendant Safra A. Catz.[6] The Lead Plaintiff alleges that two other senior executives of Oracle, Mark V. Hurd and Jeffrey O. Henley, along with Renée J. James—an Oracle Director who serviced as Chair

---

[2] The facts, except where otherwise noted, are drawn from the well-pled allegations of the Lead Plaintiff's Verified Third Amended Derivative Complaint (the "Third Amended Complaint" or "TAC") and exhibits or documents incorporated by reference therein. I draw the facts regarding the history of this litigation from two earlier Memorandum Opinions in this Action: *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018) and *In re Oracle Corp. Derivative Litig.*, 2019 WL 6522297 (Del. Ch. Dec. 4, 2019).

[3] Two months before the original Complaint was filed, another Oracle stockholder had filed a separate complaint in this Court challenging the same transaction and, on September 7, 2017, the Lead Plaintiff's complaint was designated as the operative pleading. *Oracle*, 2019 WL 6522297, at *4 n.91.

[4] TAC, ¶¶ 1, 181.

[5] *Id.* ¶¶ 2, 23.

[6] *Id.* ¶¶ 1–2, 201–05.

of the Special Litigation Committee—likewise breached fiduciary duties to Oracle in connection with the Acquisition.[7]

On March 19, 2018, I issued a Memorandum Opinion, finding that the Lead Plaintiff was excused from making a litigation demand on Oracle's Board of Directors (the "Board") under Chancery Court Rule 23.1, and that the Lead Plaintiff's claims "support[] a reasonable inference that Ellison and Catz acted disloyally in connection with the NetSuite acquisition," and, consequently, the Lead Plaintiff's complaint survived Ellison and Catz's Rule 12(b)(6) motion to dismiss.[8]

A. *The Special Litigation Committee's Investigation*

Shortly after I denied Ellison and Catz's motion to dismiss, the Board created the SLC and authorized it to: "(i) take all actions necessary to investigate, analyze and evaluate all matters relating to this lawsuit and the claims made in the action, and (ii) take any actions that the SLC deems to be in the best interests of [Oracle] in connection with this lawsuit and any related matters."[9] The Board appointed three

---

[7] *Id.* ¶¶ 25–27, 201–05. I note that Mr. Hurd died in October 2019, and that Paula R. Hurd as Trustee of the Hurd Family Trust has been substituted as a Defendant in place of Mr. Hurd. *Id.* ¶ 25. Additionally, the TAC names two additional Defendants: Evan Goldberg and Zachary Nelson, and alleges aiding and abetting of breach of fiduciary duty against them—however, I recently dismissed the claims against both Goldberg and Nelson in *In re Oracle Corporation Derivative Litig.*, 2020 WL 3410745 (Del. Ch. June 22, 2020).

[8] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018); *see* Ch. Ct. R. 12(b)(6); Ch. Ct. R. 23.1. I ordered that the parties submit supplemental memoranda pertinent to the other Defendants' motion to dismiss—which I did not rule on at that time—but the Lead Plaintiff instead voluntarily dismissed claims against all Defendants other than Ellison and Catz. *Oracle*, 2019 WL 6522297, at *6. The Lead Plaintiff later resurrected some of those claims, and, as noted, Hurd, Henley, and James are Defendants here. *Id.*

[9] *Oracle*, 2019 WL 6522297, at *7.

Oracle directors to the SLC: Leon E. Panetta, William G. Parrett, and Charles W. Moorman.[10] The SLC retained Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") and Potter Anderson & Corroon LLP ("Potter Anderson") as its counsel.[11]

Shortly after it was constituted, the SLC moved for a stay of this Action pending the completion of its investigation—the motion to stay was granted and the stay was twice extended.[12] The SLC later reported that it was "conven[ing] on a regular basis to discuss the ongoing investigation."[13] The SLC's second request for extension of the stay was granted to accommodate the SLC's attempt to settle the claims in a formal non-binding mediation with Ellison and Catz on July 2, 2019.[14]

On August 15, 2019, Potter Anderson wrote a letter to this Court reporting that the mediation had been unsuccessful and that "it appears unlikely that a settlement can be reached in the near future."[15] The letter continued: "the SLC has determined that the Lead Plaintiff should be allowed to proceed with the derivative litigation on behalf of Oracle."[16] After a "thorough investigation and evaluation of the claims raised in the derivative complaint," it was "the SLC's view that the critical legal issue of whether the challenged NetSuite acquisition will be reviewed under

---

[10] Id.
[11] Id.
[12] Id. at *7–8.
[13] Id. at *7.
[14] Id. at *8–9.
[15] Id. at *10.
[16] Id.

the entire fairness standard would not likely be resolved prior to trial, thereby posing risks to both plaintiff and defendants."[17]  The letter continued:

> [T]he SLC sought to negotiate a settlement that appropriately reflected the potential risks, advantages and disadvantages of further litigation. As noted, those settlement negotiations were not successful.  After carefully considering the issues, the SLC concluded that it would not be in Oracle's best interests to seek to dismiss the derivative claims.
>
> The SLC therefore faced the choice of either pursuing the litigation itself or allowing Lead Plaintiff to proceed on behalf of the Company. After giving the matter careful consideration, the SLC determined it was in the Company's best interests to allow Lead Plaintiff (rather than the SLC) to proceed with the litigation on behalf of Oracle.  The SLC, however continues to believe that a settlement of the claims would be the best result for Oracle.[18]

Kramer Levin reported that over the course of its investigation, the SLC requested documents from seventeen individuals or entities and interviewed forty witnesses.[19] Kramer Levin showed documents to interviewees over the course of its forty interviews and "documented in memoranda [its] findings, thoughts, and impressions from these interviews."[20]

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

*B. The Lead Plaintiff Serves Subpoenas on the SLC and Potter Anderson;
The SLC is Ordered to Produce Certain Contemporaneous Documents;
Denial of Production of the SLC's Privileged Documents Without Prejudice*

On August 29, 2019, the Lead Plaintiff served identical subpoenas (the "Subpoenas") on the SLC and Potter Anderson requesting: "[a]ll documents and communications produced to, or obtained, reviewed, considered, created or prepared by or for the Special Litigation Committee, and all documents and communications concerning this Action or the Special Litigation Committee" including all documents and communications "(i) concerning any actual, proposed or prospective action or meeting, formal or informal, of the Special Litigation Committee and (ii) obtained or reviewed by the Special Litigation Committee including, but not limited to, those obtained from Oracle, Defendants, Netsuite, the Special Transaction Committee, Moelis, Qatalyst, Skadden Arps, Wilson Sonsini, and/or T. Rowe Price."[21] The Lead Plaintiff also requested "any draft or final report prepared by the Special Litigation Committee."[22] Oracle's Board later withdrew the SLC's power and authority to "take any actions to investigate, analyze, or evaluate matters relating to [this litigation] and the claims made in [this litigation] or (ii) take other action on behalf of [Oracle] in connection with [this litigation] or related matters"—but authorized and empowered the SLC to manage issues concerning attorney-client privilege, the

---

[21] *Id*. at *11 (internal quotation marks omitted).
[22] *Id*.

6

work product doctrine, or any other privilege any immunity that may arise from this litigation and to respond to subpoenas or other requests for information.[23]

The Lead Plaintiff moved to enforce the Subpoenas; Nominal Defendant Oracle and Defendants Ellison, Catz, Hurd, and Henley moved for a protective order regarding the Subpoenas.[24]

On December 4, 2019, I issued a Memorandum Opinion finding that the Lead Plaintiff was "presumptively entitled to the production of all documents and communications actually reviewed and relied upon by the SLC or its counsel in forming its conclusions that (i) it would not be in Oracle's best interests to seek to dismiss the derivative claims and (ii) it was in Oracle's best interests to allow the Lead Plaintiff (rather than the SLC) to proceed with the litigation on behalf of Oracle."[25]  However, I also held that "[t]his universe of documents to which the Lead Plaintiff is presumptively entitled is subject to, and limited by," certain objections raised by the SLC, Potter Anderson, Oracle, and the individual Defendants.[26]

I considered the SLC's (and Potter Anderson's) objections to the Subpoenas, specifically its accusations that the Lead Plaintiff was "improperly seek[ing] the production of privileged material, including but not limited to communications

---

[23] *Id.*

[24] *Id.*  Then-Defendants Goldberg and Nelson also filed a motion for protective order.  *Id.*

[25] *Id.* at *18.

[26] *Id.*

between the SLC and its counsel, work product, and mediation submissions."[27]  I found that the Lead Plaintiff "lacks a legally cognizable basis to compel production of the SLC's documents and communications subject to privilege and work product protection at this time."[28]  Specifically, I found that the Lead Plaintiff's common-interest argument was without merit, that Delaware law does not recognize an "efficiency exception" to the attorney-client privilege or work product doctrine, and that at that moment, the Lead Plaintiff had not made the required showing under Rule 26(b)(3) "that it is unable to obtain the substantial equivalent of the SLC's work product by other means without undue hardship."[29]  I denied the Lead Plaintiff's motion to enforce the Subpoenas without prejudice, and ordered the SLC to produce to the Lead Plaintiff a privilege log of all documents it is withholding on privilege or immunity grounds.[30]

---

[27] Lead Pl.'s Mot. to Enforce Subps., D.I. 203 ("Lead Pl.'s Mot. to Enforce Subps."), Ex. E ("SLC's Responses and Objections"), at 2.

[28] *Oracle*, 2019 WL 6522297, at *23.

[29] *Id.*; *see* Ch. Ct. R. 26(b)(3).  As to mediation materials, I ordered that "to the extent that any documents or communications would be subject to production under this Memorandum Opinion but are exempt from discovery under Chancery Court Rule 174(h) they are not required to be produced."  *Oracle*, 2019 WL 6522297, at *23.

[30] *Oracle*, 2019 WL 6522297, at *23.

8

*C. The SLC's Privilege Log; The Lead Plaintiff's Motion to Compel*

Consistent with my December 4, 2019 Memorandum Opinion, the SLC has produced a privilege log to the Lead Plaintiff (the "Privilege Log").[31] The Privilege Log lists fifty-seven items that the SLC has withheld from producing to the Lead Plaintiff under privilege and/or immunity grounds.[32]

The Lead Plaintiff has moved to compel the production of forty-two of the fifty-seven items on the Privilege Log. Specifically, the Lead Plaintiff has moved to compel production of:

- All thirty-seven interview memoranda on the Privilege Log (Items 1–37) (the "Interview Memoranda").[33] All of the Interview Memoranda are withheld on work product protection grounds.[34] The Interview Memoranda include memoranda from interviews with all remaining Defendants in this Action, and certain members of Oracle's Board at the time of the Acquisition, among others.[35]

- A PowerPoint captioned "Summary of Evidence" "prepared by counsel" for its May 9, 2019 presentation to the SLC concerning factual findings and legal issues (Item 45).[36] The PowerPoint is withheld on attorney-client privilege and work product protection grounds.[37]

- The June 24, 2019 draft report of the SLC (Item 49).[38] The SLC has not logged nor produced a "final" report, and the Lead Plaintiff

---

[31] *See* Lead Pl.'s Mot. to Compel Production of Items on Privilege Log of Special Litigation Committee of The Board of Directors of Oracle Corp., D.I. 345 ("Lead Pl.'s Opening Br."), Ex. A ("SLC's Privilege Log").

[32] *See* SLC's Privilege Log.

[33] *See Id.* Items 1–37.

[34] *Id.*

[35] *Id.*

[36] *Id.* Item 45.

[37] *Id.* Item 45.

[38] *Id.* Item 49.

surmises that none was produced.[39] The draft report is withheld on attorney-client privilege and work product protection grounds.[40]

- Two tables analyzing NetSuite's financial performance (one "prepared by counsel" and the other "prepared by financial adviser at counsel's direction") given to the SLC's members at the SLC's May 9, 2019 meeting (Items 52 and 53), and damages models "prepared by financial adviser at counsel's direction" given to the SLC's members at the same May 9, 2019 meeting (Item 54).[41] The two tables and the damages models are withheld on attorney-client privilege and work product protection grounds.[42]

The Lead Plaintiff moved to compel on April 2, 2020. I heard Oral Argument on June 5, 2020 and considered the matter submitted for decision on that date.

## II. ANALYSIS

The Lead Plaintiff has vigorously pursued SLC's logged items—its arguments fall neatly into two buckets. One: may the SLC protect the items sought from production and has the SLC regardless waived any applicable protection? And two: if the Lead Plaintiff cannot surmount the SLC's invocation of protection, is the SLC's refusal to share the logged items with the Lead Plaintiff a breach of fiduciary duty? Below, I analyze these questions, in turn, and find that the SLC's work product protection sustains, and that the SLC's decision to invoke such protection is a business judgment, and not at issue in this litigation.

---

[39] *Id.* (throughout); Lead Pl.'s Opening Br., at 1.
[40] SLC's Privilege Log, Item 49.
[41] *Id.*, Items 52–54.
[42] *Id.*

10

*A. Work Product Protection; Waiver*[43]

The SLC has invoked work product protection over all forty-two items that the Lead Plaintiff seeks to compel production.[44] "The work product doctrine is intended to protect 'materials an attorney assembled and brought into being in anticipation of litigation.'"[45] The doctrine exists to permit an attorney to work freely and unreservedly on behalf of her client, and to prevent the inequity of a party being battered between the hammer and anvil of his own attorney's effort. But even where work product protection applies, it is not absolute, and is subject to waiver.[46] Thus, I must decide whether the SLC may properly invoke work product protection over the items sought by the Lead Plaintiff. I then address whether any applicable protection has been waived.

### 1. All Forty-Two Items Are Protected Work Product

Where a party seeks to compel the production over materials purportedly protected by the work product doctrine, this Court applies a sequential pair of burdens. The SLC has the initial burden to establish that the protection applies for

---

[43] The SLC has also invoked attorney-client privilege over the summary of evidence (Item 45), draft report (Item 49), and the financial analyses and damages models (Items 52, 53, and 54), but, because I find that the Lead Plaintiff cannot overcome those items' work product protection, and that such protection has not been waived, I need not reach whether the SLC has also validly asserted attorney-client privilege.

[44] SLC's Privilege Log (throughout).

[45] *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 569 (Del. Ch. 1998) (quoting *Lee v. Engle*, 1995 WL 761222, at *4 (Del. Ch. Dec. 15, 1995)).

[46] *Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1986 WL 508, at *3 (Del. Ch. Dec. 16, 1986).

11

a specific document, and, once it does so, the Lead Plaintiff has the burden to show why such protected materials should nonetheless be produced.[47]

In evaluating whether the SLC had carried its burden to show that materials at issue are entitled to work product protection, the key question I must ask is whether materials were "prepared in anticipation of litigation or for trial."[48] Otherwise stated, "the right question to ask when determining whether the work product doctrine applies is: '[u]nder the totality of the circumstances, why was the document prepared?'"[49]

Where the SLC has carried its own burden, the Lead Plaintiff must show why it is nonetheless entitled to the materials.[50] Under Chancery Court Rule 26(b)(3) a party may obtain production of materials protected by the work product doctrine "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without

---

[47] *Mechel Bluestone, Inc. v. James C. Justice Cos., Inc.*, 2014 WL 7011195, at *10 (Del. Ch. Dec. 12, 2014) ("The party asserting a claim of work product immunity has the burden of proof to establish that the protection applies for a specific document." (internal quotation marks omitted)); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1996 WL 535407, at *2 n.2 (Del. Ch. Sept. 17, 1996) ("Based upon a fairness type analysis, once the premises for the [work product] doctrine's application are established the doctrine places the burden on the party seeking to discover the documents to establish adequate reasons for such discovery, including a showing that the information cannot be obtained elsewhere."); *Nationwide Ins. Co. v. Aldershoff*, 2001 WL 1403031, at *1 (Del. Super. Sept. 10, 2001) ("Harford bears the initial burden of establishing the existence of the work product privilege before the burden will shift to Nationwide to show its substantial need for the information and the absence of undue hardship to Harford.").

[48] *Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537195, at *2 (Del. Ch. Feb. 26, 2009).

[49] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 959 A.2d 47, 52 (Del. Ch. 2008) (quoting *Pfizer v. Advanced Monobloc Corp.*, 1999 WL 743868, at *5 (Del. Super. Sept. 20, 1999)).

[50] *See Ryan v. Gifford*, 2007 WL 4259557, at *4 (Del. Ch. Nov. 30, 2007).

undue hardship to obtain the substantial equivalent of the materials by other means."[51] This rule "seeks to strike a balance between the full disclosure spirit of modern discovery rules and the adverse effect the fear of disclosure might have on the lawyer's efforts to advance his client's cause."[52] But even where such a showing of need and unavailability is made, a further subset of materials retain the protection: where the material sought to be discovered is the "mental impressions, conclusions, opinions and legal theories" of the attorney—known as opinion work product—the materials will be protected unless the party seeking those materials can demonstrate a "*more* substantial need."[53] This is an *additional* protection beyond a showing of need and unavailability that protects opinion work product "unless the requesting party can show that it is directed to the pivotal issue in the current litigation and the need for the information is compelling."[54]

### a. The Interview Memoranda

Apart from the other materials that the Lead Plaintiff seeks, the parties' attention in briefing and arguing this Motion has almost singularly focused on the

---

[51] Ch. Ct. R. 26(b)(3); *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1280 (Del. 2014).

[52] *Zirn v. VLI Corp.*, 621 A.2d 773, 782 (Del. 1993) (citing Ct. Ch. R. 26(b)(3); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 262 (Del. 1995)).

[53] *Tackett*, 653 A.2d at 262 (emphasis added and internal quotation marks omitted).

[54] *Id.*; *accord Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *3 (Del. Ch. Nov. 13, 2002) ("Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless the requesting party can show that it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling*." (italics in original)).

13

Interview Memoranda. The Lead Plaintiff surmises that the Interview Memoranda are a trove of information that will help it prevail on its breach of fiduciary duty claims. Bearing on such expectation, the Lead Plaintiff has submitted that it seeks the "benefit of the fruit of the SLC's investigation" and that the Interview Memoranda are the SLC's "official record of the facts it learned from the witness[es]."[55] Among the Interview Memoranda are memorandum from interviews with the key players in the Acquisition, including Ellison and Catz.[56]

There is no dispute that the Interview Memoranda, created during the pendency of the SLC's investigation into the claims asserted here, were prepared to aid the SLC in connection with this Action. This Court has held that work product protection applies to interview memoranda that are "notes . . . containing attorney thoughts, impressions, opinions, and conclusions regarding witness credibility and testimony" and not transcripts of interviews nor verbatim accounts of witnesses testimony.[57] The SLC has submitted that the Interview Memoranda largely reflect "information that an attorney determined to record, as well as attorney thoughts and impressions," and I consider the issues here in light of that representation.[58] The

---

[55] Lead Pl.'s Reply in Support of Mot. to Compel Production of Items on Privilege Log of Special Litigation Committee of Board of Directors of Oracle Corp., D.I. 402 ("Lead Pl.'s Reply Br."), at 4, 9.

[56] SLC's Privilege Log, Items 28–29.

[57] *Ryan v. Gifford*, 2007 WL 4259557, at *4 (Del. Ch. Nov. 30, 2007).

[58] Opp'n of Oracle Corporation's Special Litigation Committee to Lead Pl.'s Mot. to Compel Production of Items on Privilege Log, D.I. 382 ("SLC's Opp'n Br."), at 2. I note that in reliance on the SLC's representation I have not reviewed the Interview Memoranda.

contents of the Interview Memoranda—as stated by the SLC—easily fit within the recognized bounds of work product.[59]  In short, the SLC has met its burden to show that the Interview Memoranda constitute attorney work product.[60]

Applying the second burden, the Lead Plaintiff has not made the required showing under Rule 26(b)(3) to obtain the Interview Memoranda because it has failed to show that it is unable without undue hardship to obtain the substantial equivalent of the Interview Memoranda by other means.  The Lead Plaintiff will

---

[59] *E.g. Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. of Cincinnati, Inc.*, 1995 WL 347799, at *3 (Del. Ch. May 17, 1995).

[60] To the extent that the Lead Plaintiff has argued that the Interview Memoranda are not themselves work product, its argument fails.  The Lead Plaintiff contends that "[t]his Court has rejected blanket work-product claims over special committee interview notes in stockholder derivative litigation," relying heavily on a transcript opinion.  But "Transcript Rulings generally have no precedential value in this Court and they should ordinarily not be relied on as precedent—at most they offer persuasive authority." *Nicholas Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020).  The only written opinion that the Lead Plaintiff cites for its contention, *Ryan v. Gifford*, 2008 WL 43699 (Del. Ch. Jan. 2, 2008), refers to an earlier opinion in that matter, *Ryan v. Gifford*, 2007 WL 4259557 (Del. Ch. Nov. 30, 2007), that held that the documents at issue were in fact work product, but ordered *in camera* inspection to determine whether they should nonetheless be produced. *Ryan v. Gifford*, 2008 WL 43699, at *4.  The footnote in the latter *Ryan v. Gifford*, to which the Lead Plaintiff cites, simply recounts that the Court directed the interview notes be submitted for *in camera* inspection, and that the plaintiffs had made a showing of good cause to obtain non-opinion work product. *Id*. at *4 n.9.  Consequently, the *in camera* review in *Ryan v. Gifford*, as I understand it, was ordered to evaluate whether the work product was opinion or non-opinion, because the Court needed to determine the showing required of the plaintiffs to overcome the protection before it could determine whether the plaintiffs had met their burden. Therefore, contrary to the Lead Plaintiff's contention, *Ryan v. Gifford* does not support a finding that the Interview Memoranda are not themselves work product.  The Lead Plaintiff also cites *Sandys v. Pincus*, 2018 WL 3431457 (Del. Ch. July 13, 2018), but that is simply a court order granting a document request "only to the extent that the Special Litigation Committee shall produce interview memoranda and interview notes where interview memoranda do not exist, but may redact from the documents material that constitutes opinion work product." *Id*. at *1.  That brief ukase does not support the Lead Plaintiff's implied argument that the Interview Memoranda are not work product.

15

have the opportunity to depose almost all of the SLC's interview subjects.[61] The Lead Plaintiff does not dispute that it will have this opportunity, nor could it. To boot, these depositions will be under oath, unlike, I presume, the SLC's witness interviews.

The Lead Plaintiff's primary argument regarding the unavailability of the substantial equivalent of the Interview Memoranda is that without them the Lead Plaintiff lacks the ability to impeach future deponents and trial witnesses with their interview testimony.[62] Such an argument proves too much. It is true that any work product interview memorandum *may* contain assertions that will prove to be inconsistent with future statements of the interviewee; if such were the touchstone, little would be left of the protection in that context. That the Lead Plaintiff may be deprived of fertile impeachment material, therefore, cannot be the standard for unavailability under 26(b)(3). To overcome the 26(b)(3) hurdle, a party may demonstrate unavailability upon a showing that application of privilege would leave the party seeking to compel without an alternative source for the information.[63] But

---

[61] The Lead Plaintiff does note that two interview subjects—Hurd and former Oracle director Hector Garcia-Molina—have since died. However, the Lead Plaintiff has failed to argue substantial need and undue hardship specifically regarding Hurd's and Garcia-Molina's interview memoranda.

[62] Lead Pl.'s Reply Br., at 3 ("Absent the interview memos, the utility of depositions to uncover the truth is dramatically lessened. The interviewee cannot be impeached by the prior statement.").

[63] *Zirn v. VLI Corp.*, 621 A.2d 773, 782–83 (Del. 1993) ("Third, in view of the general applicability of the attorney-client privilege, there appears to be no alternative source for discovering such information."). In *Ryan v. Gifford*, 2007 WL 4259557 (Del. Ch. Nov. 30, 2007), this Court assessed whether the plaintiffs had shown good cause to obtain attorney-client privileged materials

the Lead Plaintiff has not argued that the SLC was able to obtain certain information from interviewees that assertions of privilege will prevent the Lead Plaintiff from obtaining itself. The Lead Plaintiff will be able to depose the interview subjects on no different grounds than the SLC. The Lead Plaintiff can use such depositions to learn the pertinent facts surrounding the Acquisition. The Lead Plaintiff has not shown an inability to obtain such facts.

Percolating under the surface of the Lead Plaintiff's argument is a notion that the SLC had more rapport with its interview subjects than the Lead Plaintiff will, and, consequently, the interview subjects were more forthcoming with the SLC than they will be with the Lead Plaintiff.[64] But given the SLC's mandate, it was no secret that the position of the SLC in investigating the wrongdoing alleged was potentially

under *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970); our Supreme Court has held that "[a] careful reading of the *Garner* factors demonstrates that they overlap with the required showing under the Rule 26(b)(3) work-product doctrine." *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1280–1 (Del. 2014). Applying the required showing under *Garner* of the "unavailability of information from other sources," *Ryan v. Gifford* held: "Plaintiffs have demonstrated . . . the unavailability of information from other sources, including the lack of written final report, the inability to depose witnesses regarding the report or investigation because of assertions of privilege, and the unavailability of witnesses due to invocation of the Fifth Amendment privilege not to testify." *Ryan v. Gifford*, 2007 WL 4259557, at *3. This Court continued: "[o]f particular importance is the unavailability of this information from other sources when information regarding the investigation and report of the Special Committee is of paramount importance to the ability of plaintiffs to assess and, ultimately prove, that certain fiduciaries of the Company breached their duties." *Id*.

[64] Lead Pl.'s Reply Br., at 3–4 ("[T]he utility of all deposition testimony bearing on the Catz-Nelson discussion . . . or the Goldberg-Ellison discussion or the unproduced Catz-Goldberg WhatsApp messages . . . is lessened by the unavailability of the witnesses' respective interview memos. The same is true about the diminished utility of depositions to uncover the truth about all other factual issues in the case. The entire point of gaining access to witness interviews from 2018 and 2019 is to enhance the reliability and veracity of deposition testimony in 2020 or 2021 from *hostile witnesses* about events in 2015 or 2016" (emphasis added)).

adversarial to witnesses when the statements were taken. I find the implied argument of an irreproducible rapport between SLC and the witnesses, therefore, unpersuasive.[65]

Consequently, the Lead Plaintiff has not shown under Rule 26(b)(3) that it is unable without undue hardship to obtain the substantial equivalent of the Interview Memoranda by other means.[66]

> b. Summary of Evidence; Draft Report; Financial Analyses and Damages Models

The Lead Plaintiff's grounds for obtaining the remaining items it seeks are even less compelling. The parties do not dispute that the SLC's summary of evidence (Item 45), draft report (Item 49), financial performance tables (Items 52 and 53), and damages models (Item 54) were prepared in anticipation of litigation and qualify as work product.

---

[65] Our law permits a *Zapata* special litigation committee to control litigation on behalf of the corporation only because it recognizes the ability of such a committee—when properly constituted—to "act with integrity and objectivity." *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 940 (Del. Ch. 2003) (quoting *Biondi v. Scrushy*, 820 A.2d 1148, 1166 (Del. Ch. 2003)).

[66] Because the Lead Plaintiff has not made the required showing under Rule 26(b)(3), and because to obtain opinion work product a party must make this showing and the additional showing of a "more substantial need," I need not determine whether the Interview Memoranda constitute opinion or non-opinion work product. *See Fitzgerald v. Cantor*, 1999 WL 135237, at *1 (Del. Ch. Feb. 15, 1999) (citing *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 262 (Del. 1995)) ("[A] party seeking discovery covered by the work product privilege must show a substantial need for non-opinion work product and a more substantial need for opinion work product in order to gain access to the work product." (internal quotation marks omitted)); *e.g. Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *12 (Del. Ch. Nov. 13, 2002) ("Just as Saito has failed to establish his substantial need/undue hardship for non-opinion work product, he has similarly failed to meet the higher burden required to receive opinion work product.").

Regarding the required showing under Rule 26(b)(3), the Lead Plaintiff has not shown it is unable without undue hardship to obtain the substantial equivalent of these materials by other means. These items are, on the main, compilations of conclusions derived from contemporaneous evidence and witness interviews. The SLC has already produced to the Lead Plaintiff:

> (i) all documents produced to the SLC and cited in any draft SLC report reviewed by the [SLC] (other than documents concerning the independence of the SLC members themselves), (ii) all documents shown to witnesses during SLC interviews (other than during the interviews of the SLC members concerning their qualifications to serve on the SLC), (iii) all documents produced to the SLC and cited in any PowerPoint presentations to the SLC by either the SLC's counsel or the SLC's financial adviser, and (iv) all documents produced to the SLC that the SLC had exchanged with Defendants in mediation.[67]

As noted, the Lead Plaintiff can obtain the substantial equivalent of the Interview Memoranda without undue burden. In other words, the Lead Plaintiff already has (or may obtain) the underlying factual information that, presumably, is summarized in the information sought. Armed with such information, the Lead Plaintiff can obtain the substantial equivalent of any non-opinion work product in the summary of evidence, draft report, financial performance tables, and damages models by

---

[67] SLC's Opp'n Br., at 5–6.

19

similarly compiling such facts itself.[68]  Consequently, the Lead Plaintiff has not made the required showing under Rule 26(b)(3) to obtain Items 45, 49, and 52–54.[69]

### 2. The SLC's Work Product Protection Was Not Waived

The Lead Plaintiff next argues that even if the items sought are protected— which I have determined that they are—the SLC nonetheless waived any such protection.  The source of such waiver, per the Lead Plaintiff, are the mediation statements exchanged between the SLC and Ellison and Catz during the parties' formal non-binding mediation.  The SLC concedes that the parties to the mediation exchanged their mediation statements.[70]  The Lead Plaintiff states that the "logical inference" is that the mediation statements "advised Ellison and Catz of the factual basis for the claim against them, including material information from the interview memos."[71]

Though the SLC has submitted that any documents produced to it and exchanged with Ellison and Catz at the mediation were already produced to the Lead Plaintiff, the Lead Plaintiff persists in hope that *some* protected material was disclosed in the mediation statements themselves.  In order words, the Lead

---

[68] In seeking the summary of evidence, draft report, financial analyses, and damages models the Lead Plaintiff has submitted that it is "not seeking opinion work product."  Lead Pl.'s Opening Br., ¶ 36.

[69] Though the SLC also asserted attorney-client privilege over these items, because I conclude that they are protected by the work product doctrine I need not address whether they are also protected by the attorney-client privilege.  *See Saito*, 2002 WL 31657622, at *12.

[70] SLC's Opp'n Br., at 20.

[71] Lead Pl.'s Opening Br., ¶ 34.

20

Plaintiffs' argument is based on speculation that protected materials were disclosed via the mediation statements, and that reference to or quotation of protected materials via the mediation statements nullifies such protection. Assuming that the mediation statements did disclose material protected by the work product doctrine, including, potentially, from the Interview Memoranda, does such disclosure effect a waiver of the SLC's work product protection?

Production of work product protected material on the basis of waiver is rarely ordered in Delaware because of its harsh result.[72] As Chancellor Chandler noted in *Saito v. McKesson HBOC, Inc.*,[73] "a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege."[74]

Interests of privacy are paramount when analyzing whether work product protection has been waived. To this end, "there is no waiver of privileged information to third parties if a disclosing party had a reasonable expectancy of privacy when it made an earlier disclosure."[75] In assessing whether a party had such a reasonable expectation of privacy, "the Court generally asks two questions: 1) did

---

[72] *Saito*, 2002 WL 31657622, at *3 (citing *Wolhar v. Gen. Motors Corp.*, 712 A.2d 457, 463 (Del. Super. 1997); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 260 (Del. 1995)).
[73] 2002 WL 31657622 (Del. Ch. Nov. 13, 2002).
[74] *Id*. at *3 (citing *Wolhar*, 712 A.2d at 463).
[75] *Id*. at *4.

21

the disclosing party believe its disclosure was confidential; and 2) will the law sanction that expectation?"[76]

Delaware has a strong public policy favoring confidentiality in all mediation proceedings.[77] As then-Vice Chancellor Strine relayed in *Princeton Insurance Co. v. Vergano*:[78]

> Delaware's recognition that confidentiality is vital to the effectiveness of mediation is, of course, hardly novel or path breaking. The federal courts have long utilized mediation as one of the forms of ADR required by congressional enactment and have invariably provided that communications made to or from a mediator are confidential.[79]

The rationale underlying such recognition of confidentiality is "complete candor among the parties."[80] Without this expectation of privacy, "parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure."[81]

Not only does Delaware public policy support the confidentiality of mediation, the SLC actively kept the mediation confidential as against the Lead Plaintiff earlier in this Action, making clear that the SLC believed any disclosure was confidential. The Lead Plaintiff filed a response to the SLC's motion to extend

---

[76] *Id.* (citing *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426 at *2 (Del. Ch. March 20, 1986)).
[77] *United Health All., LLC v. United Med., LLC*, 2013 WL 1874588, at *3 (Del. Ch. May 6, 2013) (citing *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 63 (Del. Ch. 2005)).
[78] 883 A.2d 44 (Del. Ch. 2005).
[79] *Id.* at 62.
[80] *Starkman v. O'Rourke*, 2019 WL 7580065, at *2 n.14 (Del. Ch. Jan. 14, 2019).
[81] *Id.* (quoting *Wilmington Hospitality, L.L.C. v. New Castle Cty. ex rel. New Castle Cty. Dep't of Land Use*, 788 A.2d 536, 541 (Del. Ch. 2001)).

22

the stay in anticipation of the mediation. In its briefing, the Lead Plaintiff stated that it "agreed to support the requested stay if Lead Plaintiff would be provided with key documents and invited to participate in the mediation."[82] The SLC rejected the Lead Plaintiff's offer, determining that the Lead Plaintiff's participation in the mediation would not be in Oracle's best interests.[83]

The SLC had a strong expectancy of privacy when it engaged in mediation with Ellison and Catz, and such expectation attached to any materials exchanged during the confidential mediation. Thus, even if the SLC disclosed work product protected materials to Ellison and Catz when they shared their mediation statements, the SLC did not waive its work product protection.

Because I have found that all materials the Lead Plaintiff has moved to compel are protected by the work product doctrine and there was no waiver, the SLC's objections are sufficient to protect the materials the Lead Plaintiff seeks from production.

### B. Fiduciary Duty

I have concluded that the Lead Plaintiff has not made the required showing under Rule 26(b)(3) to obtain the SLC's work product, and that the SLC has not waived its work product protection. The SLC has determined that it is in Oracle's

---

[82] Lead Pl.'s Resp. to Special Litigation Committee's Mot. to Extend Stay, D.I. 116, ¶ 4.
[83] Reply Mem. in Further Support of the Oracle Special Litigation Committee's Mot. to Extend Stay, D.I. 118, ¶ 6.

best interests to assert work product protection and withhold these materials from the Lead Plaintiff.[84] The Lead Plaintiff submits that such determination "lacks any reasoned, good-faith rationale" and is in breach of the SLC's members fiduciary duties to Oracle.[85] In other words, the Lead Plaintiff asserts that, even though the protection has been validly maintained as a matter of discovery law, I should find that the purported inherent breach of duty by the SLC should nonetheless lead to production. Lead Plaintiff relies on the rationale of *Zapata.*[86]

In *Zapata*, our Supreme Court observed that under 8 *Del. C.* § 141(c) a corporate board can delegate to an independent special litigation committee all of the 8 *Del. C.* § 141(a) authority the board possesses over a litigation asset.[87] The business judgment rule—an "acknowledgement of the managerial prerogatives of Delaware directors"—is a presumption that directors making a business decision acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the enterprise.[88] *Zapata* confronted the question of whether to afford business judgment rule deference to the decision of a special

---

[84] SLC's Opp'n Br., at 17.
[85] Lead Pl.'s Reply Br., at 7.
[86] *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).
[87] *Id*. at 786; *see Obeid v. Hogan*, 2016 WL 3356851, at *15 (Del. Ch. June 10, 2016).
[88] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *see In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 122 (Del. Ch. 2009) ("[D]irector action is analyzed under the business judgment rule, which prevents judicial second guessing of the decision if the directors employed a rational process and considered all material information reasonably available—a standard measured by concepts of gross negligence.").

committee to move to dismiss derivative litigation.[89]  The Supreme Court rejected

application of the business judgment rule, and instead established a now-familiar

two step analysis: Are the members of the special litigation committee independent

and did they conduct a good faith investigation of reasonable scope that yielded

bases supporting its conclusions?[90]  If so, in the Court's own independent business

judgment, should the dismissal be granted?[91]

But *Zapata*'s exception from business judgment rule review applies only

within its context: "demand-excused derivative cases in which the board sets up a[]

[special litigation committee] that investigates whether a derivative suit should

proceed *and recommends dismissal after its investigation*."[92]  In such a case, the

potential for divided loyalties and cryptic self-interest are plain, and a slavish

adherence to the presumption of business judgment would be unwarranted and naive.

Consequently, equity requires that a derivative plaintiff (and the court) be allowed

to test whether business judgment was in fact employed, via the limited analysis just

described.  In other words, had the SLC moved to dismiss this Action, I would have

applied *Zapata*'s standard of review to *that* decision.  But that is manifestly not the

---

[89] *Zapata*, 430 A.2d at 784.
[90] *Id*. at 789.
[91] *Id*.
[92] *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010) (emphasis added); *see Spiegel v. Buntrock*, 1988 WL 124324, at *3 (Del. Ch. Nov. 17, 1988) ("I read *Zapata* as a narrow exception to the business judgment form of judicial review that ordinarily precludes courts from exercising substantive judgment about the wisdom or fairness of business decisions made advisedly by independent boards in good faith.").

situation here. The SLC *did not* move to dismiss this Action (to the Lead Plaintiff's benefit).

The decision at issue here is the SLC's decision not to turn over the protected materials to the Lead Plaintiff. Because that is not a decision to dismiss this Action, it is not reviewable under *Zapata,* nor is the rationale for *Zapata* scrutiny—potential divided loyalty—applicable. Instead, the SLC retains the standard presumption of business judgement in connection with its assertion of work product protection

The true basis of the Lead Plaintiff's assertion here, as I understand it, is based instead on the *alignment* of interests between the SLC and Lead Plaintiff— maximizing the value of the litigation asset for Oracle. Bearing in mind that shared interest, in Lead Plaintiffs' view, it is inconceivable that the SLC's decision to invoke work product protection was taken in good faith. This assertion of bad faith is not, to my mind, self-proving given the facts here. The SLC is composed of fiduciaries for Oracle, who may well have good faith reasons to keep the work product done on the SLC's behalf confidential. In this light, the Lead Plaintiff's collateral attack on the business judgement of the SLC in pursuit of discovery in this litigation must fail. But, of course, like any fiduciary decision, those of the SLC can be subject to judicial review upon a sufficient pleading. The Lead Plaintiff, however,

26

has not pled any breach of duty claims against members of the SLC.[93]  Because such claims are not before me, there is nothing further to decide on the matter.

### III. CONCLUSION

The Lead Plaintiff's Motion to Compel is DENIED.

IT IS SO ORDERED.

---

[93] *See* Ch. Ct. R. 8(a) ("A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the party deems itself entitled.").